**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TAUNO WAIDLA,

*Petitioner-Appellee/*
*Cross-Appellant,*

v.

RONALD DAVIS, Warden,

*Respondent-Appellant/*
*Cross-Appellee.*

Nos.  18-99001
18-99002

D.C. No.
2:01-cv-00650-
AG

OPINION

Appeals from the United States District Court
for the Central District of California
Andrew J. Guilford, District Judge, Presiding

Argued and Submitted March 1, 2023
Pasadena, California

Filed May 23, 2023

Before:  Kim McLane Wardlaw, Paul J. Watford, and Eric
D. Miller, Circuit Judges.

Per Curiam Opinion;
Partial Concurrence and Partial Dissent by Judge Miller

# SUMMARY[*]

## Habeas Corpus / Death Penalty

In a case in which Tauno Waidla was found guilty in California state court of first-degree murder during the course of a burglary and robbery with personal use of a deadly and dangerous weapon, and was sentenced to death, the panel affirmed the district court's grant of habeas relief on Waidla's claim of ineffective assistance of counsel at the penalty phase, and affirmed the district court's denial of relief on claims at the guilt phase.

Reviewing under 28 U.S.C. § 2254(d), the panel held in the government's appeal that the California Supreme Court unreasonably applied the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), in evaluating Waidla's claim of ineffective assistance at the penalty phase. The panel concluded that had the three categories of evidence that counsel should have discovered been presented to the jury, there is a reasonable probability that at least one juror would have voted against the death penalty. The panel did not need to reach whether the denial of relief on Waidla's penalty-phase claim that he was deprived of due process by the State's presentation of false evidence violated 28 U.S.C. § 2254(d).

On Waidla's cross-appeal from the denial of relief at the guilt phase, the panel held that the California Supreme Court did not unreasonably apply *Edwards v. Arizona*, 451 U.S.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

477 (1981), and its progeny in upholding the admission of Waidla's confession. The panel reached the same conclusion when considering the question under *Rhode Island v. Innis*, 446 U.S. 291 (1980). As to Waidla's claim of ineffective assistance of counsel in four areas at the guilty phase, the panel held that the California Supreme Court could reasonably have concluded that counsel met *Strickland*'s performance standard as to two of the alleged deficiencies and that the remaining alleged deficiencies did not prejudice Waidla.

Judge Miller concurred in part and dissented in part. He wrote that the majority correctly rejected Waidla's challenges to his murder conviction, but that he would also reject Waidla's challenge to his death sentence. Judge Miller emphasized that the California Supreme Court's rejection of Waidla's ineffective assistance of counsel claim requires this court's deference, and that whatever the merits of the majority's view that counsel could have done a better job presenting a "modest" case for mitigation, the California Supreme Court's contrary conclusion was not so obviously wrong that its error lies beyond any possibility for fairminded disagreement. He would reject Waidla's penalty-phase due-process claim for the reasons given by the California Supreme Court.

## COUNSEL

Seth P. McCutcheon (argued), Scott Hayward, and Michael C. Keller, Deputy Attorneys General; Dana Muhammad Ali, Supervising Deputy Attorney General; James William Bilderback II, Senior Assistant Attorney General; Lance E. Winters, Chief Assistant Attorney General; Rob Bonta, Attorney General of California; Office of the California Attorney General; Los Angeles, California, for Respondent-Appellant.

Marta VanLandingham (argued), Tracy Casadio, Mark R. Drozdowski, Craig A. Harbaugh, and Katherine Farkas, Deputy Federal Public Defenders; Cuauhtemoc Ortega, Federal Public Defender; Public Defenders' Office; Los Angeles, California, for Petitioner-Appellee.

**OPINION**

PER CURIAM:

A California jury sentenced Tauno Waidla to death for the 1988 murder of Viivi Piirisild. The California Supreme Court affirmed his conviction on direct appeal, *People v. Waidla*, 996 P.2d 46 (Cal. 2000), and the United States Supreme Court denied his petition for a writ of certiorari, *Waidla v. California*, 531 U.S. 1018 (2000). This appeal arises from the district court's decision granting penalty phase relief on Waidla's petition for a writ of habeas corpus. The State has appealed that decision and Waidla cross-appeals the denial of guilt phase relief. We affirm.

## I. Background

### A

Tauno Waidla was born and raised in Estonia during its occupation by the Soviet Union. In 1986, when Waidla was 18 years old, he was conscripted into the Soviet Army, an institution known for mistreating Estonian soldiers. *Waidla*, 996 P.2d at 54. While stationed in East Germany, Waidla escaped with a fellow Estonian, Peter Sakarias, into West Germany. From there, Waidla and Sakarias sought and received asylum in the United States in 1987. *Id.*

Upon arriving in New York, Waidla and Sakarias were received warmly by the Estonian émigré community there. *Id.* In April 1987, Waidla moved to Los Angeles, where he met Avo and Viivi Piirisild. The Piirisilds had relocated to the United States from Estonia decades earlier and were active members of the Baltic American Freedom League, an organization devoted to fighting for the Baltic States' independence from the Soviet Union. *Id.* The Piirisilds

invited Waidla to live with them shortly after meeting him. He moved in and they paid for his food, clothes, and medical care. They also offered to help him find employment. *Id.* Waidla had applied for a radio broadcasting job and accepted occasional short-term jobs, but he was otherwise uninterested in finding work or returning to school. *Id.*

The Piirisilds asked Waidla to help them renovate their home in exchange for his room and board. *Id.* at 54–55. Waidla agreed and completed several significant projects. *Id.* at 55. At some point, Viivi indicated that Waidla could have the Piirisilds' 1978 Triumph Spitfire if he started to attend school or obtained a job. *Id.* Later, she promised him the car for finishing certain home improvement projects.

Waidla sought to collect on Viivi's promise in May 1988, claiming that he was owed for the work he had done on the house. *Id.* Viivi refused because Waidla showed no initiative to work or attend school and because the Piirisilds had paid for his work by supporting him. *Id.* Waidla became angry and threatened to report the Piirisilds for building without a permit. *Id.* He also threatened to kill Avo and to break his arm. *Id.* at 56. Viivi told him to pack and leave. *Id*. Rita Hughes, the Piirisilds' daughter, was able to calm Waidla down and help him pack, after which he left peacefully. *Id*.

Waidla began traveling with Sakarias across the country by car. While in Arizona, they sent Viivi a postcard featuring a recipe for skinning, cutting up, and cooking rattlesnake, on which they wrote: "You are as wise as the rattlesnake." Waidla also called the Piirisilds from the road several times to ask for the car or the proceeds from its sale. *Id.* During this period, Viivi expressed fear of Waidla and

Sakarias to several people, including her acquaintance George Charon, a Federal Bureau of Investigation agent. *Id.*

Waidla and Sakarias eventually made their way to Boston, where Sakarias accepted a job to deliver a pickup truck to San Francisco. *Id.* They drove to Los Angeles on their way to San Francisco. On July 4, 1988, they went to the Piirisilds' home to ask again for the car. Viivi refused to talk to them, so Avo spoke with them alone. *Id.* Avo told them that he was unable to get the car's title from the bank due to the holiday and that he would be leaving town the next day. He said that he would be gone for two weeks. Waidla and Sakarias persuaded Avo to buy gas for the pickup truck before they went on their way. *Id.* At some point, the two drove to the Piirisilds' cabin in Crestline, California, which Waidla had visited as the Piirisilds' guest in the past. *Id.* at 54, 56. They stayed there without permission for over a week, eating the Piirisilds' food and making calls. When they left, they took a hatchet and various other possessions that Sakarias later pawned. *Id.* at 56.

On July 12, the Piirisilds' neighbor saw two men that he later identified as Waidla and Sakarias walking toward the Piirisilds' home wearing jackets and carrying no bags. *Id.* at 56–57. When he saw them leave later, they carried bags and they no longer wore jackets. *Id.* On July 14, a friend checked on the Piirisilds' house at Avo's request because Avo had not been able to reach Viivi. The friend found that the kitchen door had been broken to allow entry and that Viivi had been murdered inside.

The crime scene showed that Viivi was attacked as soon as she walked into the house and was later moved from the entryway to a bedroom, where she was covered with a bedsheet. *Id.* at 57. She sustained multiple bludgeoning

wounds to the head consistent with blows from the blunt side of a hatchet. *Id.* As a result, all of the bones on one side of her face were broken. She had been stabbed four times in the chest and suffered three head wounds caused by the sharp edge of a hatchet. *Id.* One of the sharp-edged hatchet blows, which was inflicted pre-mortem, was so forceful that it cut through the top of her skull and left a flap of bone attached only by scalp tissue. The others, which had been inflicted post-mortem, left incisions on her forehead. *Id.* The medical examiner testified that post-mortem abrasions he observed on Viivi's back could have been caused by dragging her body from the entryway to the bedroom. The official cause of death was the combined effect of the bludgeoning, stabbing, and chopping wounds. *Id.*

Police found seven fingerprints at the residence. One, on the deadbolt cover of the kitchen door—the door that had been broken to allow entry—was a match for Waidla. *Id.* Police also obtained saliva samples from two cigarette butts found in the trash that matched Waidla's, but not Sakarias's, blood type. *Id.*

On July 12, Sakarias pawned two pieces of Viivi's jewelry and purchased two plane tickets to New York using Viivi's credit card. *Id.* While in New York, Waidla and Sakarias stayed with an Estonian acquaintance, Andres Juriado. When Juriado raised the news of Viivi's murder, Waidla and Sakarias changed the subject rather than engage on the topic. *Id.*

Over a month later, Waidla was arrested by United States Border Patrol in New York near the United States-Canada border on suspicion of crossing the border illegally. *Id.* He carried a loaded gun in a backpack as well as an unsent letter to Sakarias. The letter suggested that Waidla had considered

suicide but decided against it. He also wrote: "When you hear that I am dead, then you should know that I've [croaked] with a weapon in hand. If you hear that I have been taken alive . . . (almost impossible) . . . then you should know that I did my best." *Id.* at 58.

While in custody in New York, Waidla initially invoked his right to counsel during interrogation by a Border Patrol agent. *Id.* at 69. However, he later waived his rights and made incriminating statements to Los Angeles Police Department ("LAPD") Detective Victor Pietrantoni. *Id.* at 69–70. He initially denied any role in Viivi's murder, telling Pietrantoni that he and Sakarias had parted ways after leaving the Piirisilds' cabin in Crestline and that he had hitchhiked to New York where he met up with Sakarias. Confronted with incriminating evidence, he admitted greater involvement. Waidla confessed to breaking into the Piirsilds' home with Sakarias with the intention of eating food and asking Viivi about the Triumph Spitfire. At first, he denied committing any acts of violence against Viivi, claiming that when Viivi came home, he ran outside in fear while Sakarias attacked Viivi. His retelling then changed a final time, at which point he admitted that when Viivi came home, he struck her once with a "hammer," causing them both to fall backwards. He stated that he did not see the rest of the attack.

## B

At trial, Waidla's counsel sought to suppress his confession and "put the prosecution to it's [sic] proof that Mr. Waidla was present and participated in the homicide." Counsel argued in a motion to suppress that because Waidla had invoked his right to counsel when interrogated by a Border Patrol agent, his later waiver of the right to counsel

was invalid. In a suppression hearing held near the end of the State's case Detective Pietrantoni testified that Waidla had initiated their conversation. The trial court held that Waidla's waiver was therefore valid and admitted the confession. *Id.* at 68–70.

Waidla's counsel sought and obtained a short continuance at the close of the State's case to reformulate his strategy because he had not expected the court to admit Waidla's confession. Counsel did not pursue a mental state defense because two pretrial mental health evaluations had found that Waidla had no psychiatric condition that could have prevented him from forming the intent to kill. Without investigating any avenues of defense further, counsel advised Waidla that "he needed to testify to any bases for repudiating the validity of the confession and any alibi." Waidla confirmed that he could truthfully recant his confession.

At trial, Waidla testified that he was coerced by LAPD detectives, who he said had threatened to hang him if he did not repeat back a confession they fed to him. *Id.* at 58. Familiar with the violent interrogation style of the KGB from personal experience, Waidla said that he believed the threat and did not feel free to deny his guilt. *Id.* He testified that he had begun hitchhiking to New York before the murder occurred, as he initially told Detective Pietrantoni. *Id.*

After four days of deliberation, the jury found Waidla guilty of first-degree murder during the course of a burglary and robbery with personal use of a deadly and dangerous weapon, a capital crime.

C

Neither side presented additional evidence at the penalty phase.  Defense counsel stated on the record that he had "sound tactical reasons" for resting on the mitigation evidence elicited during the guilt phase.  The trial court agreed that counsel had put forth "a tremendous amount of evidence about the defendant's background."  The court specifically referenced an article that Waidla published in a Canadian newspaper giving a first-hand account of his time in the Soviet Army.  The article, entitled *Escaping Through the Fog*, detailed the harsh conditions Waidla experienced during his service.  For example, he spent long periods in the bitter cold, was given ill-fitting, dirty clothes, slept in crowded spaces, and received abysmal medical care for a respiratory infection.  Waidla wrote that while in the military hospital, "[a]ll wishes to exist disappear[ed]."

Waidla's counsel later acknowledged that he had not investigated any mitigating evidence aside from that presented during the guilt phase.  He did not seek out any evidence related to Waidla's positive adjustment to incarceration, although he was aware that Waidla had not been subject to any disciplinary proceedings while awaiting trial.  He also made no attempts to contact Waidla's family, friends, or acquaintances from Estonia to obtain background or good character mitigation evidence.  According to counsel, Waidla "expressed considerable reluctance" when it came to a social history investigation because he did not want his family to know about his situation and because he feared that Soviet authorities would retaliate against any Estonian who aided in his defense.  When counsel revisited the question, Waidla acknowledged that his loved ones likely knew about the case, but he remained concerned about

their safety. Ultimately, counsel "did not definitively resolve the issue" with Waidla.

Counsel's penalty phase argument principally pleaded for the jury's mercy. Counsel's discussion of Waidla's struggles in the Soviet Army was limited to his observation that "after three weeks in a Russian Army hospital Mr. Waidla was so consumed by a desire for freedom . . . that he risked everything to run." Counsel also referenced the limited information available about Waidla's background and character. He drew the jury's attention to Waidla's lack of criminal history and youth. He recalled testimony from Avo and Rita that Waidla had been friendly, nonaggressive, and helpful around the house. Counsel argued that Waidla had been cooperative with law enforcement. Finally, counsel asked the jury to show Waidla mercy because he had no one who could testify to his character, from which the jury could infer that he was "essentially alone in this world."

The State largely argued that the horrific nature of the crime warranted death. The prosecutor detailed the brutality of the attack. He described Viivi's wounds in detail and argued that Waidla had struck the "death blow" with the sharp edge of the hatchet. He characterized the crime as planned, calculated, and especially callous given the kindness Viivi had shown Waidla.

The State also maligned Waidla's character by portraying him as a deserter from the Soviet Army and as a lazy "parasite" who believed that "he deserved to be taken care of," citing his refusal to look for work or attend school. The State suggested that Waidla had a propensity for violence because he had been willing to harm others during his escape from the Soviet Army if the need arose and because he carried a loaded gun when Border Patrol agents

arrested him, which his unsent letter to Sakarias suggested he might use to harm any officer who tried to arrest him. According to the State, these incidents "revealed his violent nature" and showed that "killing doesn't mean anything to Mr. Waidla."

After hearing no new evidence and less than a day's worth of argument at the penalty phase, the jury went on to deliberate over the course of nine days. On day three, the jury sent a note asking what would happen if the jurors could not reach unanimity. *Waidla*, 996 P.2d at 80. On day five, the jury sent a note stating that it was deadlocked. *Id.* A poll of the jurors revealed that ten of twelve believed they could not come to a unanimous verdict. Still, the court asked the jury to continue deliberating. *Id.* On day nine, the jury returned a death verdict. *Id.*

## D

Waidla filed state habeas corpus petitions in 1999 and 2001. In them, he asserted, among other claims, ineffective assistance of counsel at the guilt and penalty phases, prosecutorial misconduct, and failure to suppress his confession as required by the Fifth Amendment.

In support of his claim of ineffective assistance of counsel at the penalty phase, Waidla offered three categories of mitigation evidence that could have been presented had counsel conducted an adequate investigation: (1) evidence of his psychosocial history and character; (2) evidence of the abuse faced by Estonians serving in the Soviet Army; and (3) evidence that he had behaved well in custody prior to trial.

Mare Pork, a professor of clinical psychology in Estonia, interviewed Waidla's family members, friends, and teachers.

Dr. Hillevi Ruumet, an Estonian-American clinical psychologist, conducted interviews that corroborated the information gleaned from Pork's interviews. We recount their relevant combined findings.

Waidla's parents asked Waidla's great-uncle Gunnar and Waidla's grandmother Linda to raise him when he was just one month old. Waidla saw his mother only occasionally after that, and essentially never saw his father. When Waidla was 11 years old, Linda developed a debilitating brain tumor. From that time until she passed several years later, she became "uncontrollably abusive" to those around her. Waidla became very attached to Gunnar, who "in many ways took the place of both mother and father" for Waidla. As a teen, Waidla's favorite cousin and an aunt who had taken on the role of his primary female caregiver died in a house fire, which devastated him. In all, three maternal figures—his mother, grandmother, and aunt—abandoned him or passed away before Waidla turned 15.

Waidla displayed a "strong will to succeed" and a "desire for excellence" in his athletic pursuits. He attended a prestigious sports school for marksmanship, where his coach recalled that Waidla "was the best shooter in his [grade] and the only one who spent more hours training than was required by the overall training schedule." Although he focused more on sports, he also maintained adequate grades. Waidla developed a "reputation among his teachers and coaches [for] having a lot of willpower and a desire to fight for justice." According to a family friend who was a well-known photographer, Waidla also showed a facility for photography. He published several photographs in magazines and newspapers.

According to Gunnar, Waidla "never showed a violent or aggressive nature" in social environments and was not one to get into fights with peers. Waidla's primary marksmanship coach similarly recalled that Waidla "was a consistently peaceable and non-violent youth, who was never aggressive or bullying toward his classmates or other competitors." Other coaches and students at the school concurred in that assessment.

Psychologist Dr. Myla Young evaluated Waidla to determine whether he posed a risk of violence in a carceral setting. Personality testing showed that Waidla had a "pro-social orientation" and was a "fundamentally non-violent, non-confrontational individual." Over the ten years she had spent evaluating individuals in criminal proceedings, Waidla exhibited "fewer risk factors to violence than any individual [she had] ever examined."

Dr. Young reviewed information about Waidla's background, which supported her clinical findings. She opined that Waidla had "a very difficult and stressful early life." She found it notable that despite the "traumatic separation" from his parents, Waidla "was able to achieve strong psychological and emotional bonding with his Great-Uncle Gunnar and other members of the family." These connections "permitted Mr. Waidla to develop [an] intact personality structure." Waidla's well-formed personality structure was consistent with "the positive efforts he made within the family and in his academic and athletic efforts," as well as his "impeccable record of peaceableness [sic]" outside of Viivi's murder. Dr. Young concluded that Waidla's was "a very unusual case in which an otherwise pro-social, law-abiding, and high-achieving individual lapsed into a momentary assaultive outburst . . . and has led an entirely non-violent life both before and afterward."

Dr. Ruumet also conducted clinical interviews of Waidla. Based on those interviews and her assessment of Waidla's background, she confirmed the psychological conclusions reached by Dr. Young. Her clinical evaluation showed that Waidla was "passive, intelligent, socially appropriate and invested in giving a good impression, respectful of authority, diffident, and avoidant of any confrontation or physical violence." In fact, she found that Waidla displayed a "characterological aversion to confrontation and violence."

Next, Waidla offered postconviction evidence of the cruelty endured by Estonian conscripts in the Soviet Army. Dr. Ruumet declared that serving in the Soviet Army in the 1980s as an Estonian was "a guarantee of extended physical beatings and brutality" and carried a serious risk of death. Hazing was rampant and "any superior could, with total impunity, inflict any kind of physical or mental suffering on any inferior at any time and for any (or no) reason." Dr. Ruumet conveyed the story of an Estonian soldier who died of kidney failure because he was denied water as a form of punishment. Such stories were not "isolated incident[s]." These conditions were the product of Russians' longstanding prejudice against Estonians, with whom Russians had ethnic and linguistic differences. Waidla sent a letter to family during his service asking for their help, in which he expressed suicidal thoughts and fear for his life.

Finally, Waidla provided evidence that he had adjusted to incarceration without disciplinary incident. The State produced a memorandum authored by the District Attorney's office evaluating whether the death penalty was appropriate for Waidla and Sakarias in January 1989, several months after Waidla's arrest (the "DA memo"). The DA memo reported that while incarcerated, Sakarias had been

found in possession of weapons several times. Whereas Sakarias had been designated an escape risk and the DA memo concluded that he was "a danger to others even while in custody," the memo was silent as to Waidla's disciplinary history and observed that Waidla did not "evidence the same degree of danger to society."

Waidla submitted a declaration detailing his positive experience in Wayside Maximum Security, where he was incarcerated for three months prior to trial. He applied for and obtained jobs in the kitchen and maintenance units. He received a uniform reserved for inmates with a clean behavioral record as well as a pass that allowed him to work outside of the dormitories. He swept, passed out toilet paper, and buffed floors. Waidla spent his free time in the library reading the newspaper and improving his English. Unlike most inmates, he was allowed to read in the library rather than taking his reading materials to his cell.

When Waidla was transferred to San Quentin State Prison after trial, California Department of Corrections officials conducted Waidla's orientation review to assign him housing (the "CDC document"). The committee verified Waidla's statement that he had "no problems programming in the county jail" by contacting the jail. Officials there "stated that Waidla was not a disciplinary problem and programmed well with other inmates."

E

The California Supreme Court rejected Waidla's Fifth Amendment claim on direct appeal, *Waidla*, 996 P.2d at 71, denied relief on Waidla's prosecutorial misconduct claim in a reasoned opinion, *In re Sakarias*, 106 P.3d 931, 950 (Cal. 2005), and summarily denied his ineffective assistance of counsel claims on the merits. On federal habeas review, the

district court granted relief on Waidla's claim of ineffective assistance at the penalty phase and rejected Waidla's remaining claims. The State appeals the decision granting penalty phase relief and Waidla cross-appeals the denial of relief on his prosecutorial misconduct, Fifth Amendment, and guilt phase ineffective assistance claims. The Antiterrorism and Effective Death Penalty Act of 1996 governs our review because the California Supreme Court rejected each of the claims at issue here on the merits. *See* 28 U.S.C. § 2254(d). We begin our discussion with the State's appeal before turning to Waidla's cross-appeal.

## II. Penalty Phase Claims

Waidla's sole claim of error at the penalty phase is that his counsel rendered ineffective assistance by failing to investigate and present mitigation evidence that competent counsel would have discovered. *Strickland v. Washington*, 466 U.S. 668 (1984), sets out the standard for ineffective assistance of counsel claims. Under *Strickland*, Waidla must first show that his counsel's performance "fell below an objective standard of reasonableness" under prevailing professional norms. *Id.* at 688. *Strickland* creates a strong presumption that counsel's performance "falls within the wide range of reasonable professional assistance." *Id*. at 689. Counsel's strategic decisions, if "made after thorough investigation of law and facts," are "virtually unchallengeable." *Id.* at 690. We assess a particular decision not to investigate or to limit the scope of investigation for reasonableness. *Id.* at 691.

If Waidla can show that counsel's performance was deficient, he must then establish prejudice. *Id.* at 694. To assess prejudice at the penalty phase, we reweigh all of the evidence in aggravation and mitigation and ask whether, had

counsel provided competent representation, "there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 537 (2003); *see also id*. at 534, 536.

When 28 U.S.C. § 2254(d) applies, we defer to a state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." When reviewing a state court decision for which there is no reasoned opinion, we must consider any arguments that could have supported the state court's decision. *See Harrington v. Richter*, 562 U.S. 86, 102 (2011). We may grant Waidla habeas relief only if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Id.*

We hold that the California Supreme Court unreasonably applied *Strickland*'s standard in evaluating Waidla's claim of ineffective assistance at the penalty phase. Had the three categories of evidence that counsel should have discovered been presented to the jury, there is a reasonable probability that at least one juror would have voted against the death penalty.

A

We begin with the adequacy of counsel's investigation of mitigation evidence. Counsel admittedly conducted no investigation into mitigation evidence beyond any incidental investigation he made of evidence relevant at the guilt phase. Competent counsel would have sought out and introduced evidence concerning Waidla's background and character,

the hardship Estonians faced in the Soviet Army, and Waidla's good behavior while in custody awaiting trial. Counsel's disregard for all three possible mitigation strategies makes clear that his incompetence is "beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

*Background and Character Evidence.* The record shows that counsel "abandoned [his] investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources," thereby violating basic professional standards. *Wiggins*, 539 U.S. at 524; *see also Apelt v. Ryan*, 878 F.3d 800, 831 (9th Cir. 2017) ("There can be no doubt that counsel was required to review a defendant's background in preparation for sentencing."). The duty to investigate a defendant's social history was as foundational at the time of trial as it is now. Practice guidelines in effect in 1990, which guide our analysis of what qualifies as reasonable professional conduct, *Strickland*, 466 U.S. at 688, stated that "[c]ounsel in a capital case is obligated to conduct a thorough investigation of the defendant's life history and background." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 8.1, commentary (1989). Abdicating this duty, counsel interviewed Waidla alone and did not procure any psychological or psychosocial evaluations.

Waidla's resistance to having counsel perform a social history investigation did not eliminate counsel's duty to investigate his background. To be sure, "[c]ounsel's actions are usually based, quite properly, on informed strategic choices made by the defendant." *Strickland*, 466 U.S. at 691. But counsel "never made a serious attempt to educate [Waidla] about the consequences of his decision." *Silva v.*

*Woodford*, 279 F.3d 825, 841 (9th Cir. 2002). We acknowledge that Waidla's concern for the safety of Estonian witnesses was legitimate and genuinely held. Still, that concern was only part of the calculus. Counsel himself admitted that, far from fully advising Waidla on the benefits and drawbacks of an investigation, he "did not definitively resolve the issue" with Waidla. In fact, Waidla realized that one basis for his reluctance to have counsel contact witnesses in Estonia was unreasonable, showing that he continued to actively consider the issue. Failing to advise Waidla of the importance of mitigation evidence was especially detrimental because, as Waidla stated in his declaration, he "did not have an understanding of the American legal system [and] did not know what would constitute a presentation of 'mitigation' evidence."

The State's comparisons to the investigations held competent in *Strickland* and *Burger v. Kemp*, 483 U.S. 776 (1987), are unconvincing. Counsel in both cases made an informed strategic decision to limit their social history investigations because they knew that presenting social history evidence would prove harmful. In *Strickland*, counsel sought to avoid opening the door to evidence of the defendant's criminal history, bad character, and intact psyche. *See* 466 U.S. at 672–74, 699. In *Burger*, counsel sought to keep the defendant's criminal history from the jury, as well as testimony from family and acquaintances about his drug use and violent tendencies. 483 U.S. at 791–95. Counsel also reasonably decided against a mitigation strategy that required testimony from the defendant, who showed a lack of remorse and, according to a psychologist, might have bragged about the crime on the witness stand. *Id.*

No such concerns are evident in this case. Waidla had no criminal history and his social history would not have

revealed any significant prior bad acts. Further, no psychological expert identified him as a liability on the stand and he expressed deep remorse for Viivi's murder. Thus, *Strickland* and *Burger* are not instructive on this point.

Finally, although counsel would have faced logistical hurdles to investigating abroad, those challenges did not eliminate counsel's duty to investigate. In *Apelt v. Ryan*, a case governed by 28 U.S.C. § 2254(d), we considered whether counsel had performed deficiently in representing a capital defendant who had lived in Germany until six months before the crime. 878 F.3d at 805, 830–31. Since counsel was aware that a social history investigation could have revealed useful mitigation evidence, we held that he had rendered ineffective assistance because his co-counsel made only one trip to Germany and was unable to communicate with the defendant's German-speaking family while there. *Id.* As in *Apelt*, Waidla's counsel was on notice of the need for a social history investigation. He knew that Waidla's upbringing was not traditional in that Waidla had not been raised by his parents. That counsel broached the question of investigating in Estonia with Waidla multiple times shows that he was aware of the significance of a social history investigation. Yet, as in *Apelt*, counsel fell short of professional standards by abandoning his efforts to investigate through travel to Estonia or other means. *Id.*

Moreover, the record shows that investigating in Estonia, while more challenging than a domestic investigation, would not have been the "dauting task" the State claims. In 1989 and 1990, communication between the United States and Estonia was possible via fax, phone, and mail. Dr. Ruumet reports that by June 1990, "the Soviet regime had loosened enough to allow relatively unfettered travel in and out of the country." And although a personal visit by counsel to

Estonia may have been possible, counsel need not have personally traveled to Estonia, as Professor Pork would have interviewed Waidla's family and acquaintances on counsel's behalf. Because California provides indigent defendants with funding for efforts "reasonably necessary for the preparation or presentation of the defense" upon an application by counsel, Cal. Penal Code § 987.9(a), the costs of international investigation were not insurmountable. Notably, counsel in Sakarias's trial, which occurred within a year of Waidla's trial, was able to obtain social history interviews from Sakarias's family and friends in Estonia. *In re Sakarias*, 106 P.3d at 936, 949. Thus, counsel's violation of minimum professional standards was not excused by logistical barriers.

*Mistreatment in the Soviet Army.* Counsel's duty to investigate a defendant's social history no doubt includes an obligation to seek out evidence of childhood hardship because "[e]vidence of abuse inflicted as a child is especially mitigating." *Andrews v. Davis*, 944 F.3d 1092, 1117 (9th Cir. 2019) (en banc).

Waidla was still a teenager when he was conscripted into the Soviet Army. *Waidla*, 996 P.2d at 54. Counsel was aware of this chapter in Waidla's life because Waidla's article, *Escaping Through the Fog*, detailed the experience to an extent. Yet counsel did not argue that Waidla's hardships were relevant to the jury's decision, nor did he attempt to obtain additional contextual evidence about the indignities visited on Estonian conscripts in the Soviet Army.

Had counsel investigated, he would have found that in addition to the crowded lodging, repeated exposure to bitter cold, and inadequate medical care described in Waidla's

article, Estonian soldiers often encountered serious physical abuse and even death at the hands of Russian soldiers and officers. Counsel would have learned of the psychological impact that looming danger had on Waidla, whose letter to his family begging for help spoke to his despondency and fear. Armed with this evidence, competent counsel would have argued that Waidla's time in an abusive institutional setting detracted from his culpability.

The State makes much of the fact that the jury had access to some evidence about Waidla's time in the Soviet Army. *Escaping Through the Fog* was introduced during the guilt phase and in his testimony, Avo indicated he agreed with the statement that "traditionally draftees from the Baltic States were not treated very well in the Soviet Army." According to the State, the jury's awareness of this evidence eliminated any need for counsel to investigate cumulative evidence concerning the abuse endured by Estonian soldiers. We disagree. The State improperly emphasizes the mere existence of evidence in the record while disregarding counsel's obligation to explain the relevance of that evidence to the jury. The State also overstates the cumulative nature of the postconviction evidence.

First, counsel's obligations do not end at ensuring that mitigation evidence is accessible to the jury. That is all that counsel did with respect to Waidla's time in the Soviet Army. Avo's testimony did not make an appearance in counsel's guilt or penalty phase arguments. Counsel also never argued at the penalty phase that Waidla's article evidenced hardship that ought to inform the jury's sentencing decision. Nor did this evidence feature in the State's case in a way that would alert the jury to its mitigating force. The State referenced the article for its discussion of Waidla's escape from the Soviet Army, not its

description of his experiences prior to escape. It was incumbent on counsel not just to make sure that this mitigation evidence made it to the jury, but to identify its existence and to argue its relevance. *See Rogers v. Dzurenda*, 25 F.4th 1171, 1189 (9th Cir. 2022) (finding deficient performance when counsel's opening statement gave the jury "inadequate context for how the evidence would relate to the insanity defense"). Counsel failed to fulfill that aspect of his professional duty.

Perhaps the glaring omission of the argument that Waidla's mistreatment in the Soviet Army reduced his culpability could be excused as a strategic decision. Such strategic decisions, when reasonably well-informed, are entitled to deference. *Strickland*, 466 U.S. at 690. But even if we could conceive of a strategic purpose for leaving this mitigation evidence unmentioned, counsel did not make a decision with the benefit of all of the evidence at his disposal. After proper investigation, counsel could have made a significantly more forceful version of the argument that Waidla was mistreated in the Soviet Army, as discussed below. Thus, any strategic decision was fatally underinformed.

Nor could a fairminded jurist conclude that it was reasonable to eschew further investigation on the theory that only cumulative evidence could be obtained. Waidla's article only vaguely references the hostility between Estonian and Russian soldiers and does not adequately convey the extent of the power disparity favoring the Russians. Avo attested to the power imbalance to some extent, but provided no detail about the nature of the abuse, nor did he testify about the practices in effect during Waidla's service. This evidence left a significant gap in

explaining the severity of the likely abuse as well as its systemic nature.

*Bobby v. Van Hook*, 558 U.S. 4 (2009), on which the State relies, is inapposite. There, because counsel had gathered significant evidence of the defendant's abusive family life, he was reasonable to forego obtaining additional, likely cumulative, testimony on that topic from more distant relatives. *Id.* at 10–12. In contrast, it should have been clear to Waidla's counsel that he could have sought out evidence not just corroborating Waidla's article but providing much-needed context for it.

We are not persuaded by the State's contention that "cumulative evidence that other soldiers were also mistreated lacked any real significance, especially if Waidla was not aware of the circumstances." First, according to Dr. Ruumet, the risks to Estonian conscripts were so widely known that Estonians frequently took measures to avoid placement in units with more Russian soldiers, like the one Waidla ended up in, which were especially dangerous. Thus, Waidla surely understood the scope of the danger that awaited him.

Second, it is highly relevant that Estonian soldiers were subjected to widespread, state-sanctioned abuse rooted in prejudice. Without that context, the jury could have misinterpreted Waidla's account of harsh training tactics and fights between Estonian soldiers and their Russian counterparts as commonplace drills and roughhousing rather than sanctioned institutional abuse. The information provided by Dr. Ruumet would have also supported an argument that Waidla did not just endure run-of-the-mill discomforts while serving, but also suffered significant fear and emotional distress, as shown by Waidla's desperate

letter to family requesting that, as Dr. Ruumet paraphrased, they "try to save him." Because context was so crucial to understanding Waidla's experience, counsel could not have reasonably forgone investigation into this mitigation strategy simply because the jury had access to Waidla's account.

*Good Behavior in Custody Awaiting Trial.* It is well established that "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating." *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986); *see also Williams v. Taylor*, 529 U.S. 362, 396 (2000) (failure to present, *inter alia*, prison guard testimony that defendant was not dangerous or violent as well as prison records demonstrating good behavior contributed to finding of deficient performance). The import of such mitigating evidence is particularly clear when the State argues for the death penalty on the ground that a defendant "could not be trusted to behave if he were simply returned to prison." *Skipper*, 476 U.S. at 5 n.1. Here, the State made a similar argument by telling the jury that Waidla had a "violent nature" and that killing meant nothing to him.

Counsel was on notice that, contrasting with the State's narrative that Waidla posed a risk of future violence, Waidla had not encountered any disciplinary issues while incarcerated pending trial. Yet counsel ignored this "tantalizing indication[] in the record," *Stankewitz v. Woodford*, 365 F.3d 706, 720 (9th Cir. 2004), of a possible mitigation strategy based at least in part on Waidla's good behavior. Counsel's failure to pursue this viable strategy was unreasonable. We consider in turn the State's arguments to the contrary, finding each unpersuasive.

First, the California Supreme Court could not reasonably have found counsel's performance adequate by disregarding Waidla's evidence as inadmissible or conclusory. To make out a prima facie case in a California habeas petition, a petitioner must attach "reasonably available" documentation supporting his allegations. *People v. Duvall*, 886 P.2d 1252, 1258 (Cal. 1995). A petitioner may not rely on hearsay evidence to make out a prima facie case, *People v. Madaris*, 122 Cal. App. 3d 234, 241–42 (1981), *overruled on other grounds by People v. Barrick*, 654 P.2d 1243, 1250 (Cal. 1982), nor on "subjective, self-serving" statements, *In re Alvernaz*, 830 P.2d 747, 756–57 (Cal. 1992). Looking to this procedure, the State argues that the California Supreme Court could have declined to consider the CDC document noting that Waidla behaved well in county jail as hearsay and could have found Waidla's remaining evidence conclusory.

Fairminded jurists would agree that Waidla offered enough admissible evidence to show that counsel rendered ineffective assistance. That is true even assuming the CDC document is inadmissible hearsay. Waidla's declaration explaining the privileges he accrued in county jail for good behavior may be self-serving, but it is hardly conclusory. The declaration explains, based on Waidla's personal knowledge, that he enjoyed freedoms reserved for well-behaved prisoners like the ability to read in the library and the ability to leave the dormitories for his job. That evidence is more than a bare allegation of good behavior. *See SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007) (differentiating self-serving declarations from conclusory ones that offer no admissible facts).

Waidla's declaration, which speaks to three months of his confinement, is corroborated by other evidence. The DA memo recommends seeking the death penalty for Sakarias

but not Waidla in part because Waidla, unlike Sakarias, did not face disciplinary action during the first several months of his confinement. The State does not argue that the DA memo is inadmissible hearsay and we have previously considered the State's decision to seek or not seek the death penalty against a co-defendant in this context. *See Sanders v. Davis*, 23 F.4th 966, 994 (9th Cir. 2022). The declaration is also corroborated by Waidla's lack of criminal history and Dr. Young's opinion concerning his nonviolent personality structure. Waidla's evidence is, therefore, far from conclusory.[1]

Second, the State argues that the California Supreme Court properly denied this subclaim because counsel's declaration "sheds no light on Waidla's behavior while in custody or trial counsel's decisions concerning such behavior." Not so. Counsel was aware that "there were no disciplinary proceedings against Mr. Waidla." True, he gave no explanation for his failure to investigate the matter, but he admitted that he conducted no investigation whatsoever. It is therefore clear that his decision not to pursue this strategy did not stem from strategic insight gained after

---

[1] Typically, upon finding that a state court decision violated 28 U.S.C. § 2254(d), the federal habeas court undertakes *de novo* review of the claim before granting relief. *See Frantz v. Hazey*, 533 F.3d 724, 737 (9th Cir. 2008) (en banc). The district court did not explicitly conduct *de novo* review. On appeal, the State takes issue only with the district court's § 2254(d) analysis. Accordingly, the State has forfeited any objection that the district court erred by granting relief based on the evidence submitted in support of Waidla's petition rather than evidence adduced in a new evidentiary hearing. To the extent the State makes an argument limited to this subclaim that the district court should have required *admissible* evidence of Waidla's good behavior before granting relief, we find that argument unavailing because Waidla's evidence apart from the CDC document could have been rendered in admissible form.

additional investigation.  The State cites no authority for the proposition that trial counsel must affirmatively state that he lacked a strategic purpose, and we will not adopt that rule here.

Moreover, we cannot discern from the record any strategy that might have justified counsel's inaction.  Any suggestion that counsel could reasonably have decided against investigating on the theory that juries are usually unpersuaded by good behavior evidence is untenable.  It would be difficult to reconcile that view with *Skipper*'s holding that good behavior evidence must be admitted as mitigation, *see* 476 U.S. at 5, let alone *Williams*'s holding that counsel was deficient in part for not gathering such evidence, 529 U.S. at 396.  *See also Deck v. Missouri*, 544 U.S. 622, 633 (2005) (noting that whether the defendant is "a danger to the community" is "nearly always a relevant factor in jury decisionmaking, even where the State does not specifically argue the point").

Finally, the State contends that presenting good behavior evidence could have indicated to the jury that no better mitigation evidence was available.  But had counsel conducted an adequate investigation, Waidla's good behavior in custody while awaiting trial would not have stood alone in Waidla's mitigation case.  It would have stood alongside and complemented the other evidence we have already found counsel could have introduced.  Thus, counsel's failure did not stem from a reasonable strategic judgment, but from an oversight that cannot be squared with even *Strickland*'s forgiving standard.

## B

Having concluded that counsel performed deficiently by failing to introduce and argue several categories of

mitigation evidence, we must now determine whether counsel's incompetence prejudiced Waidla. To do so, we reweigh the aggravation evidence against the mitigation evidence that ought to have been presented to the jury. *Wiggins*, 539 U.S. at 534.

One factor relevant to assessing whether a reasonable probability exists that one juror would have voted differently is the jury's behavior at trial. Long deliberations relative to the complexity of the case and indications of close jury deliberations "weigh against a finding of harmless error because [they] suggest a difficult case." *United States v. Velarde-Gomez*, 269 F.3d 1023, 1036 (9th Cir. 2001) (en banc) (internal quotation marks and citation omitted); *Noguera v. Davis*, 5 F.4th 1020, 1045 (9th Cir. 2021).[2] We also consider the strength of the aggravation evidence and the nature and quality of the mitigation evidence originally presented in comparison to the nature and quality of the new mitigation evidence. *See Wiggins*, 539 U.S. at 537–38.

With these factors in mind, we conclude that the California Supreme Court could not reasonably have found

---

[2] The State contends otherwise. In its view, lengthy jury deliberations do not necessarily signify jury indecision. But the jury notes indicating deadlock gave a clear picture about the reason for its long deliberations. The State also hypothesizes that the jury's deadlock could have been unrelated to the balance of mitigation and aggravation evidence and instead caused by, for instance, a juror's misunderstanding of an instruction. But jury questions indicating deadlock show that the death sentence "was not a foregone conclusion, especially given that the jurors' only task at that point was to decide between a sentence of life without parole and death." *Silva*, 279 F.3d at 849–50. Even if the jury had been preoccupied with a mitigation factor unrelated to Waidla's background or character, evidence on those factors could have moved an uncertain jury to weigh the totality of the circumstances differently.

that counsel's failures were non-prejudicial. The jury delivered a death sentence knowing very little about Waidla's background and positive qualities. Even so, it took the jury nine days of deliberation and two bouts of deadlock to reach a verdict. No fairminded jurist considering a jury so closely divided could discount the prejudicial effect of failing to present even modest evidence of Waidla's background and good character.

The difference between the mitigation evidence actually presented and the evidence that competent counsel would have presented is significant. As the background evidence the jury heard was scant, we have no trouble recounting it again here: Waidla was born in Estonia, a country then occupied by the Soviet Union, and was raised by family members other than his parents. He testified that he had two encounters with the KGB as a teen in which he was detained and beaten for allegedly protesting against the Soviet Union. At age 18, he was conscripted into the Soviet Army, where Estonians were generally not treated well. If the jury in fact read *Escaping Through the Fog*, which is not clear from the record, it would have learned that Waidla experienced harsh living conditions and once fled from a brawl between Russian and Estonian soldiers, before falling ill and ultimately escaping. While living with the Piirisilds, Waidla was typically friendly and demonstrated his construction skills by completing several home improvement projects. He was just 20 at the time of the crime and had committed no prior felonies. Finally, Waidla cooperated with law enforcement after his arrest.

Waidla's mitigation case at trial essentially amounted to an incomplete picture of the adversity he faced in the Soviet Army, his age, and his lack of criminal history. The sparseness of this evidence is akin to counsel's presentation

in *Wiggins*, where the "sentencing jury heard only one significant mitigating factor—that Wiggins had no prior convictions," 539 U.S. at 537, as well as that in *Porter v. McCollum*, 558 U.S. 30 (2009) (per curiam), where the mitigation case consisted of "inconsistent testimony about Porter's behavior when intoxicated and testimony that Porter had a good relationship with his son," *id.* at 32.

If Waidla had been competently represented, the jury would have heard much more. To start, competent counsel would have made the jury aware of Waidla's many positive character traits. One such trait was Waidla's strong work ethic. Waidla worked hard at marksmanship as a teen, showing dedication and skill that surpassed his peers. He also excelled in photography, having worked under the tutelage of his great-uncle Gunnar to learn the proper techniques. In jail pending trial, Waidla worked maintenance and kitchen duty jobs, which entailed physical labor like buffing floors. He spent free time in the library strengthening his English and reading newspapers.

Waidla's consistent dedication to his pursuits could have undercut the State's portrayal of Waidla as entitled and parasitic. Counsel would have also directly refuted the State's contention that Waidla was lazy by referring to the testimony from Dr. Ruumet, who opined that Waidla's perceived laziness was possibly attributable to depression brought on by "circumstances in which he had lost his whole support system and in which he felt helpless and overwhelmed." Dr. Ruumet's analysis was in line with Dr. Young's assessment, based on psychological testing, that "depression is an underlying component of Waidla's character."

Another character trait of note was Waidla's pro-social nature and his "characterological aversion to confrontation and violence." Loved ones, acquaintances, and coaches all attested to Waidla's distaste for conflict and his peaceable disposition. Dr. Young opined that Waidla was the least violence-prone prisoner she had ever evaluated in the context of criminal proceedings. This testimony would have complemented and added credibility to evidence counsel could have presented of Waidla's compliant and nonviolent behavior while in jail awaiting trial. There, guards and a librarian afforded him special privileges that would not have been fitting for a dangerous prisoner. The State suggests that evidence of Waidla's good behavior in jail would not influence jurors who knew that he carried a loaded gun and a threatening note at the time of his arrest. We disagree because that assessment disregards the character evidence that likewise points to his peaceful nature.

Evidence of Waidla's lack of future dangerousness would have undermined the State's contention that Waidla had a "violent nature," and that "killing doesn't mean anything" to him. That much is clear from *Skipper*, in which the relevance of similar evidence was "underscored . . . by the prosecutor's closing argument, which urged the jury to return a sentence of death in part because petitioner could not be trusted to behave if he were simply returned to prison." 476 U.S. at 5 n.1.

Competent counsel would have introduced the evidence that Waidla was conscripted into the Soviet Army, where it was common knowledge that Estonians were targeted for serious physical and emotional abuse. Even if the jury took the time to review Waidla's article closely, which we cannot be sure of, it would not have known the full extent of the possible danger to Waidla. Waidla's depiction of his

experiences in the Soviet Army takes on new meaning when viewed in proper context, namely, a context of institutionalized and prejudice-based abuse that could prove fatal. The postconviction evidence therefore revealed the true nature of the psychological toll that conscription took on Waidla.

Finally, competent counsel would have presented the humanizing evidence about Waidla's strong bonds to family members, including his great-uncle Gunnar, whom Waidla idolized and, according to Gunnar, related to as "both mother and father." The jury would have learned that Waidla's connections to family enabled him to withstand the hardships of his early life. This evidence would have allowed the jury to view Waidla as a three-dimensional person with the ability to form meaningful connections, a stark contrast from the caricature of a callous murderer presented by the State. *See Porter*, 558 U.S. at 41 ("The judge and jury . . . heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability.").

In sum, competent counsel would have rounded out the jury's understanding of Waidla's humanity and positive qualities. At the same time, counsel would have marshalled the evidence to counter the State's arguments that Waidla was lazy, dangerous, and cruel. Our confidence in the jury's verdict is undermined because "the task [the jury] actually undertook differed so profoundly from the one it would have performed had [Waidla's] counsel not been deficient." *Boyde v. Brown*, 404 F.3d 1159, 1180 (9th Cir. 2005), *as amended*, 421 F.3d 1154 (9th Cir. 2005).

We are unpersuaded that Waidla's mild resistance to having counsel contact his loved ones and acquaintances in

Estonia eliminates the prejudice associated with counsel's failure to do so, as in *Schriro v. Landrigan*, 550 U.S. 465 (2007). "[W]e have held that the *Landrigan* prejudice holding does not apply when the defendant 'did not threaten to obstruct the presentation of any mitigating evidence.'" *Sanders*, 23 F.4th at 981 (quoting *Hamilton v. Ayers*, 583 F.3d 1100, 1119 (9th Cir. 2009)). *Landrigan* is not controlling in this case.

Waidla's reluctance pales in comparison to the opposition at issue in *Landrigan*. There, Landrigan hamstrung any and all attempts by counsel to present a mitigation argument, including by interrupting during counsel's proffer of evidence to the judge and by asking the judge to impose the death penalty. *Landrigan*, 550 U.S. at 470, 476–80. By contrast, Waidla merely voiced concerns about conducting an investigation in Estonia in conversations with counsel. He never indicated that he would obstruct counsel. Additionally, counsel in *Landrigan* advised his client strongly against his preferred course of action and attempted to present mitigation evidence over his client's objections. *Id.* at 479–80. Waidla received markedly less diligent representation, as counsel simply did not press the issue enough to reach resolution on it. In other words, *Landrigan* does not govern because the major gap in Waidla's mitigation case is attributable to counsel's actions rather than Waidla's.

We acknowledge that the mitigation strategy outlined above is a modest one. Waidla's social history does not reveal facts that often support a finding of prejudice like abject abuse or serious mental incapacity. *See, e.g.*, *Williams*, 529 U.S. at 395–98. We also recognize that good character evidence sometimes lacks persuasive force in the face of a "gr[isly] murder." *Bemore v. Chappell*, 788 F.3d

1151, 1172 (9th Cir. 2015).  But crucially, we are called on to determine whether fairminded jurists could conclude that this mitigation evidence gives rise to a reasonable probability that at least one juror would have voted differently.  Waidla meets that standard given the jury's uncertainty, the extremely minimal mitigation evidence originally presented, and the missed opportunity to rebut various aspects of the State's aggravation argument, which was itself modest.

C

Waidla argues, as an alternative ground for affirmance, that he was deprived of due process by the State's presentation of false evidence against him.  Specifically, the California Supreme Court found that the State misattributed the two post-mortem sharp-edged hatchet blows to Waidla at trial.  *In re Sakarias*, 106 P.3d at 950.  Nevertheless, the court denied relief due to lack of prejudice.  *Id.*  We need not decide whether that denial violated 28 U.S.C. § 2254(d) in light of our holding that penalty phase relief is warranted on Waidla's ineffective assistance of counsel claim.

III.  Guilt Phase Claims

The district court denied relief on the two claims of error at the guilt phase that Waidla raises on cross-appeal.  Waidla first contends that his Fifth Amendment rights were violated when the State introduced his confession at trial.  Waidla also asserts that he received ineffective assistance of counsel during the guilt phase.  Reviewing under 28 U.S.C. § 2254(d), we agree with the district court's assessment that these claims lack merit.

A

Waidla argues that his confession was improperly admitted in violation of the Fifth Amendment. We provide factual background before turning to the claim.

*Background*. Border Patrol agents apprehended Waidla in New York near the Canadian border and arrested him on suspicion of illegal entry into the country. *Waidla*, 996 P.2d at 69. During interrogation at a Border Patrol station in Rouses Point, New York, Waidla invoked his right to counsel and was then moved to another facility where he was detained. *Id.* The next day, a Border Patrol agent transported Waidla back to Rouses Point and placed him in a holding cell. *Id.*

During the suppression hearing, Detective Pietrantoni and Waidla testified differently as to what transpired at Rouses Point. As the trial court found Pietrantoni more credible, we recount his version of events.

Officers removed Waidla from the holding cell and took him into the adjoining administrative area where he saw Detective Pietrantoni dressed in civilian clothes. Pietrantoni was in New York to interrogate Waidla and to bring him to Los Angeles following an extradition hearing. *Id.* Speaking first, Waidla asked: "[Y]ou're the detective from Los Angeles?" When Pietrantoni confirmed that he was, Waidla asked either, "What do you want from me?" or "What can I do for you?" *Id.* Pietrantoni took Waidla into another room where Waidla waived his *Miranda* rights before Pietrantoni questioned him and eventually obtained his confession. *Id.* at 69–70.

The trial court admitted Waidla's confession because Waidla had initiated the dialogue with Detective Pietrantoni.

*Id.* at 70.  On direct appeal, the California Supreme Court upheld the trial court's factual finding that Waidla had started the conversation and concluded that, as a matter of law, Waidla's question amounted to initiation of interrogation.  *Id.* at 71.

*Discussion*.   The California Supreme Court did not unreasonably apply *Edwards v. Arizona*, 451 U.S. 477 (1981), and its progeny in upholding the admission of Waidla's confession.  *Edwards* holds that a suspect who has invoked the right to counsel may not be "subject[ed] to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."  *Id.* at 484–85.  Initiating statements are those that "represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation."  *Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983) (plurality opinion).

Fairminded jurists could conclude that law enforcement did not recommence interrogation in the sense relevant to the *Edwards* analysis.   Cases finding *Edwards* violations involve police-initiated meetings that a suspect understands are interrogation attempts.  *See Edwards*, 451 U.S. at 487 (police "told Edwards that they wanted to talk to him"); *Minnick v. Mississippi*, 498 U.S. 146, 149 (1990) (jailers told Minnick he would "have to talk" to an officer who arrived to interview him and "could not refuse").  Unlike the suspects in those cases, Waidla had little reason to expect that he would be questioned when he encountered Detective Pietrantoni.  Waidla testified at the suppression hearing and at trial that he had no idea why he had been brought to Rouses Point.  He maintained that position before the district

court.[3]  Moreover, Pietrantoni was not in uniform at the time, the encounter did not begin in an interrogation room, and no other contextual cues suggested to Waidla that interrogation was forthcoming.  Thus, it is reasonable to conclude that Waidla did not experience his encounter with Pietrantoni as a coercive attempt at further interrogation.

In light of Waidla's lack of knowledge of the purpose for his transport, it is not enough to observe that law enforcement brought about his encounter with Detective Pietrantoni.  As the California Supreme Court recognized, no Supreme Court case has found an *Edwards* violation based on a police-initiated meeting alone.  *Waidla*, 996 P.2d at 71.  To be sure, snippets from some cases suggest that a suspect truly initiates only if he requests the meeting in which interrogation recommences.  *See, e.g.*, *McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991) (police may not "approach[] for further interrogation" or "initiate an encounter" following a suspect's invocation of rights); *Patterson v. Illinois*, 487 U.S. 285, 290 (1988) ("[A] suspect may not be questioned again unless he initiates the meeting.").  But we do not interpret those general statements in a vacuum.  *Edwards* created a prophylactic rule to protect suspects from the coercive effect of persistent interrogation attempts.  *See Maryland v. Shatzer*, 559 U.S. 98, 104–05 (2010).  Not all police-initiated meetings following an invocation of rights carry coercive potential.  A reasonable

---

[3] Waidla invites us to discount his own testimony as inconsistent with Detective Pietrantoni's testimony that Waidla recognized him on sight as an LAPD detective.  But Pietrantoni's explanation for Waidla's behavior, credited by the trial court, was that Waidla may have seen him before and therefore recognized him.  *Waidla*, 996 P.2d at 69.  Thus, the trial court could have validly relied on Waidla's testimony that he lacked awareness of the reason for his transport.

jurist could conclude that, absent a suspect's belief that he will be questioned during an encounter, the coercive effect of a police-initiated interaction is minimal. Thus, the fact that law enforcement manufactured Waidla's contact with Pietrantoni does not, on its own, render his confession inadmissible.

We reach the same conclusion when considering the question, as Waidla urges us to, under *Rhode Island v. Innis*, 446 U.S. 291 (1980). *Innis* holds that law enforcement engages in the "functional equivalent" of interrogation when it takes action that is "reasonably likely to elicit an incriminating response." *Id.* at 301. The *Innis* analysis "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Id.* Fairminded jurists could conclude that because Waidla did not know he was transported to facilitate further interrogation, simply encountering Detective Pietrantoni was not reasonably likely to draw any admissions from him. Further, there is no evidence to suggest that any involved officer could have predicted that Waidla would recognize Pietrantoni as a detective when he was wearing civilian clothes. Waidla's response was therefore an "unforeseeable result[]" of delivering him into Pietrantoni's presence. *Id.*

Finally, Waidla suggests that his question to Detective Pietrantoni was vague and possibly hostile, rather than a clear attempt to initiate further interrogation. But even the more ambiguous formulation of Waidla's question—"What do you want from me?"—was no less ambiguous than the phrase that initiated further interrogation in *Bradshaw*: "Well, what is going to happen to me now?" 462 U.S. at 1045 (plurality opinion). The California Supreme Court reasonably concluded that Waidla's question "represent[ed] a desire . . . to open up a more generalized discussion," *id.*,

particularly in light of Pietrantoni's testimony that before he began his questioning, Waidla interrupted him several times with offers to discuss the investigation, *Waidla*, 996 P.2d at 69–71.

B

Waidla also raises a claim of ineffective assistance at the guilt phase. He contends that counsel rendered ineffective assistance in four areas: (1) investigating and litigating the motion to suppress Waidla's confession; (2) counseling Waidla to recant his confession and testify to an alibi; (3) failing to investigate alternative defenses; and (4) failing to rebut the State's expert testimony regarding the lifespan of fingerprints.

To prevail, Waidla must show that counsel's performance "fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. Because 28 U.S.C. § 2254(d) applies, we may grant relief only if we can answer both questions in the affirmative "beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. Here, the California Supreme Court could reasonably have concluded that counsel met *Strickland*'s performance standard as to two of the alleged deficiencies and that the remaining alleged deficiencies did not prejudice Waidla.

*Suppression Motion.* Waidla identifies two failures in counsel's approach to litigating the motion to suppress his confession: (1) counsel should have pressed for an earlier decision on the motion; and (2) counsel should have investigated more thoroughly. The first argument fails because it incorrectly presumes that counsel had control over

the timing of the suppression hearing.  The second fails because it impermissibly relies on facts knowable only in hindsight.

Counsel adequately and timely litigated the motion to suppress.  He filed moving papers in advance of trial and he acted reasonably by not pushing for a suppression hearing at that time because it appeared possible that the State would ultimately not seek to introduce Waidla's confession.  Further, the trial court had discretion to hear the motion at a time of its choosing and it acceded to the State's request to defer the issue.  Waidla does not point to any feature of state law that would have allowed counsel to compel the court to hold a hearing sooner.  Thus, counsel reasonably refrained from making a likely futile request for an earlier hearing.

Based on what he knew at the time, counsel could reasonably have determined that further investigation into whether Waidla had initiated interrogation was unnecessary to litigating the suppression motion.  *Strickland* cautions that we must not fall prey to the "distorting effects of hindsight" in assessing counsel's performance.  466 U.S. at 689.  The prosecutor had given counsel full access to his files.  Those files gave counsel no indication that Detective Pietrantoni would testify that Waidla had initiated the interrogation.  In fact, the State had concluded preliminarily that Waidla's statement was likely obtained in violation of *Arizona v. Roberson*, 486 U.S. 675 (1988), a case applying the rule set out in *Edwards*.  Even the prosecutor represented that Pietrantoni's testimony at the suppression hearing came as a surprise.  Thus, counsel had little reason to think that interviewing the officers involved or conducting other investigation would inform his strategy in arguing the suppression motion.  That is especially true because Waidla maintained that he had not initiated the interrogation.  *See*

*Strickland*, 466 U.S. at 691 ("[W]hen the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether.").

*Waidla's Testimony.*    Faced with the trial court's decision to admit Waidla's extremely damaging confession, counsel made a strategic decision to advise Waidla to recant his confession.  Waidla argues that counsel's strategic choice fell short of objectively reasonable standards of representation.  Reviewing under 28 U.S.C. § 2254(d), we cannot conclude that the California Supreme Court unreasonably applied *Strickland*'s performance prong.

Counsel could have made the reasonable professional judgment that letting the confession stand uncontested would have proved fatal to Waidla's defense.  Waidla confessed not only to his presence during the crime, but to physically striking Viivi with the murder weapon.  Failing to dispute the validity of this confession would have left the jury with little room to form a reasonable doubt as to Waidla's guilt.  Thus, it would have been reasonable for counsel to conclude that presenting Waidla's testimony "was the only way to potentially rebut" the State's overwhelming evidence of guilt.  *Allen v. Woodford*, 395 F.3d 979, 1000 (9th Cir. 2005).

*Failure to Investigate Alternative Defenses.*    Waidla argues that counsel rendered ineffective assistance by failing to investigate any alternative defense strategy.  Counsel admitted that he prepared just one approach—suppressing Waidla's confession and casting doubt on the State's evidence of Waidla's involvement—before having to abandon it upon the court's denial of the suppression motion.

Waidla identifies as one viable alternative defense that Waidla was present at the scene of the crime because he intended to negotiate Viivi's debt to him, but that he did not ultimately participate in Viivi's murder. Additionally, he argues that counsel should have investigated a mental state defense based on diminished capacity because the two pretrial psychological evaluations found only that Waidla was generally capable of forming an intent to kill, not that he in fact formed that intent. These claims fail for lack of prejudice.

Fairminded jurists could conclude that even if counsel had offered evidence that Waidla was present at the Piirisilds' home but uninvolved in the murder, there was no reasonable probability the jury would have reached a different verdict. Waidla argues that he could have offered testimony showing that his intent in confronting Viivi was to obtain payment for his household work. But to the extent Waidla invites an inference from that evidence that he did not ultimately participate in Viivi's murder, that inference holds up no better than Waidla's alibi defense. Crucially, Waidla's confession cast doubt on that theory just as it cast doubt on Waidla's alibi. And the claim that he was there but uninvolved would have been undermined by evidence of Waidla's consciousness of guilt. Specifically, Waidla fled after the crime, reacted strangely when an acquaintance told him about Viivi's death, and initially lied to the police about his presence during the crime. *Waidla*, 996 P.2d at 57, 69. Thus, an alternative defense based on Waidla's non-involvement faced challenges similar to the defense actually mounted.

As for a mental state defense, Waidla offered extremely minimal postconviction evidence of diminished capacity or severe emotional disturbance. Only one postconviction

psychologist's evaluation assessed Waidla as suffering from dissociative disorder, and even that evaluation did not go so far as to suggest that Waidla's dissociative disorder prevented him from forming the requisite intent in killing Viivi.

Moreover, the evidence showed that the crime was planned and deliberate, severely undercutting a possible mental state defense. Waidla waited until Avo was out of town to confront Viivi; he took the hatchet from the Piirisilds' cabin for the confrontation; he parked some distance from Viivi's house, presumably to avoid alerting her to their presence; and he made some efforts to clean up the scene of the crime after killing Viivi. *Waidla*, 996 P.2d at 56–57. These considered actions tend to show that Waidla acted with foresight and deliberation throughout the crime. Thus, fairminded jurists could conclude that a mental state defense would not have proved persuasive. *See Crittenden v. Ayers*, 624 F.3d 943, 960–63 (9th Cir. 2010) (finding no prejudice when counsel presented alibi defense over mental state defense because the evidence overwhelmingly established deliberation and premeditation).

*Fingerprint Lifespan.* Waidla's counsel failed to present expert testimony to rebut erroneous testimony from a State witness that fingerprints have a "lifespan" of only ten days to three weeks. *Waidla*, 996 P.2d at 57. That testimony undermined the defense argument that Waidla's fingerprint on the Piirisilds' deadbolt could have been left when Waidla was last in the Piirisilds' home more than six weeks prior to the crime. Even assuming counsel performed deficiently by failing to offer rebuttal expert testimony, the California Supreme Court could reasonably have concluded that Waidla was not prejudiced by counsel's shortcoming.

The evidence overwhelmingly showed that Waidla was present at the Piirisilds' home during the crime even without the fingerprint evidence in question. Most notably, Waidla confessed that he had been there. *Waidla*, 996 P.2d at 58. A neighbor also identified Waidla as one of two men he had seen walking to and from the Piirisilds' home around the time of the crime. *Id.* at 56–57. The State presented evidence of cigarette butts found inside the house that matched Waidla's (but not Sakarias's) blood type, which was significant because Viivi did not allow smoking inside the house and therefore an invited guest would not have left the cigarettes. *See id.* at 57. Finally, the evidence showed that Waidla had fled the country after the crime, *id.* at 57–58, showing consciousness of guilt. *See People v. Bradford*, 929 P.2d 544, 575 (Cal. 1997) (explaining relevance of flight to jury's determination of guilt).

Moreover, the defense theory that Waidla left a fingerprint over six weeks prior to the crime strained credulity to begin with. Witnesses testified that Viivi was a thorough and frequent cleaner. In line with that testimony, police found only seven prints in the home while investigating, suggesting that the home had been cleaned recently. Yet Waidla argues that a jury would have concluded that a fingerprint on a high-touch surface, the door, somehow survived for over a month. Considering the weakness of this theory and the overwhelming evidence of Waidla's presence at the scene of the crime, the California Supreme Court could have concluded there was no reasonable probability of the jury reaching a different outcome had the State's fingerprint lifespan testimony been refuted.

*Cumulative Error*. Waidla raises a claim of cumulative error alleging that counsel's various inadequacies at the guilt

phase combined to prejudice him.  In assessing a cumulative error claim, we do not consider the prejudicial effect of nonexistent errors.  *See United States v. Jeremiah*, 493 F.3d 1042, 1047 (9th Cir. 2007).   Even assuming counsel performed deficiently in failing to investigate additional defenses and failing to present rebuttal testimony on the lifespan of fingerprints, Waidla cannot prevail on his claim of cumulative error.  The fingerprint claim posits that Waidla was robbed of an opportunity to convince the jury that he was *not* present during the crime, while the failure to investigate claim proceeds on the assumption that Waidla *was* present.   Thus, counsel's alleged missteps lack the "symmetry" of errors that "amplify each other in relation to a key contested issue in the case" and result in cumulative prejudice. *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011).

*          *          *

We affirm the district court's grant of habeas relief on Waidla's claim of ineffective assistance of counsel at the penalty phase.  We also affirm the district court's denial of Waidla's remaining claims for relief.

**AFFIRMED.**

MILLER, Circuit Judge, concurring in part and dissenting in part:

Born in 1967 in Soviet-occupied Estonia, arrested as a dissident and beaten by the KGB, conscripted into the Soviet Army and violently abused by Russian soldiers, Tauno Waidla managed to escape from behind the Iron Curtain and find freedom in the West. He came to the United States, where he was welcomed by Viivi and Avo Piirisild, an Estonian émigré couple who gave him food, clothing, and a place to live. But Waidla was not satisfied with the Piirisilds' generosity. He became convinced that they also owed him a car. When they refused to give it to him, he broke into their house and murdered Viivi by splitting open her head with an axe.

Today, the court correctly rejects Waidla's challenges to his murder conviction, so I join Part III of its opinion. But unlike the court, I would also reject Waidla's challenge to his death sentence. The California Supreme Court considered Waidla's claim of ineffective assistance of counsel and rejected it on the merits. That decision requires our deference, and I would reverse the judgment below to the extent that it granted habeas relief. (Waidla also asserts that he was deprived of due process in the penalty phase of his trial; I would reject that claim for the reasons given by the California Supreme Court. *In re Sakarias*, 106 P.3d 931, 950 (Cal. 2005).)

The Sixth Amendment guarantees criminal defendants "the Assistance of Counsel." U.S. Const. amend. VI. In *Strickland v. Washington*, the Supreme Court held that to establish constitutionally ineffective assistance of counsel, a defendant must demonstrate that (1) his representation was deficient, or "fell below an objective standard of

reasonableness," and (2) the deficiencies caused him prejudice, which requires "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). "Judicial scrutiny of counsel's performance must be highly deferential," and we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

That deference is heightened where, as here, a federal court reviews a state-court conviction in habeas. The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, provides that when a claim has been "adjudicated on the merits in State court proceedings," a federal court may grant habeas relief only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Obtaining relief requires a petitioner to "show far more than that the state court's decision was 'merely wrong' or 'even clear error.'" *Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020) (per curiam) (quoting *Virginia v. LeBlanc*, 582 U.S. 91, 94 (2017) (per curiam)). Instead, it requires the petitioner to demonstrate "that the state court's decision [was] so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)); *see Gibbs v. Covello*, 996 F.3d 596, 603 (9th Cir. 2021).

When we combine the deference that *Strickland* and AEDPA both require, our review becomes "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). "Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with

unreasonableness under § 2254(d)." *Richter*, 562 U.S. at 105. To evaluate deficiency through the lens of AEDPA, we ask "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* And even if we recognize a deficiency in counsel's performance, we cannot say that prejudice resulted unless the state court's contrary view would be erroneous "beyond any possibility for fairminded disagreement." *Id.* at 103; *see Premo v. Moore*, 562 U.S. 115, 130 (2011).

Waidla argues that he was denied effective representation because trial counsel did not investigate or present three types of mitigating evidence, relating to (1) his early life, (2) his experiences in the Soviet Army, and (3) his good behavior in jail. Waidla has not established either deficient performance or prejudice with respect to any of his claims. He certainly has not shown that it was unreasonable for the California Supreme Court to reject them.

*First*, Waidla argues that counsel was ineffective because he did not obtain evidence about Waidla's childhood in Estonia that could have humanized him to the jury. There was a good reason why counsel did not obtain such evidence: When counsel tried to investigate Waidla's family background, Waidla told him not to do so. As counsel later explained, Waidla "expressed considerable reluctance in having me contact his family or calling them as witnesses" because "he was concerned about possible reprisals against his family by Soviet government or military authorities if they were to attempt to come to the United States and testify, because of his desertion from the Soviet army and escape from East Germany." Waidla himself had been the victim of Soviet reprisals. At trial, Waidla testified that when he was a student, the KGB had twice arrested him for protesting the regime, on one occasion beating him so badly that they broke

his arm. Counsel repeatedly tested Waidla's reluctance and suggested alternatives such as contacting his childhood teachers or other community members, but Waidla expressed the same concerns about reprisals against them. Waidla's resistance was steadfast despite multiple conversations and proposals.

Counsel's ultimate decision to accede to Waidla's wishes was far from unreasonable. To the contrary, it was consistent with professional standards, which recognized that a lawyer "should defer to the client regarding . . . concern for third persons who might be adversely affected" by litigation tactics. Model Rules of Pro. Conduct r. 1.2 cmt. (Am. Bar Ass'n 1989). "Competence does not require an attorney to browbeat" the client into producing mitigating evidence, "especially when the facts suggest that no amount of persuasion would have succeeded." *Mirzayance*, 556 U.S. at 125; *cf. Schriro v. Landrigan*, 550 U.S. 465, 477 (2007).

Waidla now says, however, that "as Soviet control over . . . Estonia was diminishing in the late 1980s, the basis for Waidla's concern about possible reprisal was also eroding." The Supreme Court has cautioned against the "distorting effects of hindsight" in evaluating counsel's performance. *Strickland*, 466 U.S. at 689; *see also Richter*, 562 U.S. at 107; *Bell v. Cone*, 535 U.S. 685, 702 (2002). While the Court's cases have focused on litigation hindsight coming from knowledge of how the trial turned out ("examining counsel's defense after it has proved unsuccessful," *Strickland*, 466 U.S. at 689), Waidla's argument relies on a different but equally fallacious kind of hindsight: geopolitical hindsight coming from knowledge of how the Cold War ended.

Waidla's penalty-phase trial took place in January 1991. Evaluating his counsel's performance at a remove of more than three decades, it is easy to forget that the world was very different then. Estonia remained under Soviet occupation, and it was far from clear that the occupation would come to a peaceful end. As the Baltic states attempted to reassert their independence, the Soviet Union strongly resisted their efforts. Less than two weeks after the closing arguments in Waidla's trial, the Soviets sent tanks into Vilnius in response to the Lithuanian declaration of independence. Bill Keller, *Soviet Loyalists in Charge After Attack in Lithuania; 13 Dead; Curfew Is Imposed*, N.Y. Times, Jan. 14, 1991, at A1. Days later, a similarly violent military intervention took place in Latvia. Serge Schmemann, *Soviet Crackdown: Latvia; Soviet Commandos Stage Latvia Raid; At Least 5 Killed*, N.Y. Times, Jan. 21, 1991, at A1. Against this backdrop, Waidla's observation that it would have been possible for his counsel to communicate with people in Estonia is entirely beside the point. The concern he expressed was not that communicating with his friends and relatives in Estonia would pose logistical hurdles; it was that doing so would put them at grave risk of Soviet reprisals. The brutality of the Soviet Union in its waning days vividly demonstrates the basis for that concern.

Not to worry, Waidla says, because "arrangements could have been easily made to meet in Finland" with potential Estonian witnesses to avoid Soviet detection. To be fair, there was recent precedent for such an operation: A few years earlier, Oleg Gordievsky, a high-level KGB officer and British double agent, had been exfiltrated from the Soviet Union to Finland in the trunk of a British diplomatic car. But if the Sixth Amendment does not guarantee a defendant the advocacy of Clarence Darrow, *see Yarborough v. Gentry*,

540 U.S. 1, 10 (2003) (per curiam), surely it does not
guarantee him the tradecraft of MI6.

At the time of Waidla's trial, a reasonably competent
attorney—one not assisted by clandestine operatives of Her
Majesty's Government—would have struggled to determine
how to obtain evidence from Soviet-occupied Estonia to
assist a defector who had opposed the Soviet regime, while
somehow not endangering those who remained under its
rule. And the information that counsel had already collected
about Waidla's childhood gave no indication that additional
evidence would pay large dividends for his client. In addition
to interviewing Waidla, who had little to say about his
upbringing, counsel requested evaluations from two
psychiatrists. Those evaluations were likewise
unremarkable. They reported that Waidla's parents had
divorced when he was young, that he had little contact with
them and was instead raised by a maternal uncle and
grandmother, that he had feared going out alone in public as
a teenager, and that he was an average student who attended
regular classes and had no behavior problems. There was no
hint of childhood trauma, *e.g.*, *Wiggins v. Smith*, 539 U.S.
510, 525 (2003), or mental illness, *e.g.*, *Porter v. McCollum*,
558 U.S. 30, 40 (2009) (per curiam). This was "not a case in
which the defendant's attorneys failed to act while
potentially powerful mitigating evidence stared them in the
face." *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009) (per
curiam).

"[T]he duty to investigate does not force defense lawyers
to scour the globe on the off chance something will turn up."
*Rompilla v. Beard*, 545 U.S. 374, 383 (2005). "Questioning
a few more family members and searching for old records
can promise less than looking for a needle in a haystack,"
and the prospects darken considerably when the haystack is

under Soviet occupation. *Id.* at 389. At a minimum, fairminded jurists could disagree about whether it was reasonable for counsel to respect Waidla's wishes and decline to pursue a line of inquiry that could jeopardize the safety of people he cared about in a Soviet-occupied country without any clear benefit for his defense.

*Second*, Waidla argues that counsel was ineffective because he did not present sufficient evidence of the hardship that he endured as a conscript in the Soviet Army. But the jury already had powerful evidence of the abuse that Waidla suffered. After he came to the United States, Waidla wrote a newspaper article—which Viivi helped him translate into English—describing in detail his experiences in the Soviet Army. During the guilt phase of Waidla's trial, the parties introduced the article into evidence, and Waidla testified about it at length.

In the article, *Escaping Through the Fog*, Waidla wrote that after being conscripted, he endured nights in bitterly cold weather in flimsy, overcrowded tents, "[b]ut we are not humans anymore—we are now Russian soldiers." He was transported to East Germany in a cattle car. During marches, "[w]ho walks a little slower gets a boot on his backside." After being forced to undress outside in the freezing cold for an apparent medical exam, he developed pneumonia. At the hospital, "there are not enough beds and there are too many sick people," and the staff forced him to wash the floors even though he had "never felt worse in [his] life." Waidla suffered abuse at the hands of Russian soldiers who were hostile to Estonians, and his despair was constant: "All wishes to exist disappear"; "No, two years of this dog[']s life I can not bear"; "I have to get out of this hell. That kind of life is not worth living." Eventually, he and a fellow Estonian conscript escaped to West Germany by leaving their base,

stealing a car, driving to the inner German border, and climbing the fence.

Waidla's account in *Escaping Through the Fog* was bolstered by other evidence introduced at trial. Avo testified that he understood the Soviet Army to have mistreated conscripts like Waidla from the Baltic states. He also said that when Waidla arrived at the Piirisilds' home soon after his escape, he was "haggard" and "perhaps a little undernourished."

Given the force of that evidence, counsel reasonably decided not to seek additional evidence about Waidla's mistreatment in the army. As in *Strickland*, counsel's decision not to seek more evidence "than was already in hand" fell "well within the range of professionally reasonable judgments." 466 U.S. at 699.

Waidla objects that counsel did not do enough to explain to the jury the mitigating force of his experiences. During closing argument, however, counsel expressly argued that the hardship Waidla endured in the Soviet Army was a mitigating factor weighing against the death penalty. Counsel elicited the key points about Waidla's suffering in the Soviet Army and the bravery of his escape. He emphasized that Waidla had lived under "the dictatorial rule of the Soviet Union" and that "after three weeks in a Russian army hospital . . . was so consumed by a desire for freedom . . . that he risked everything . . . to run across East Germany to the West, to freedom." *See Gentry*, 540 U.S. at 6–7 (holding that counsel was not ineffective when his closing argument made "several key points," even if he omitted others that "would unquestionably have supported the defense"). Reviewing the transcript of closing argument 30 years later, one can come up with ways in which counsel

might have made even more compelling use of Waidla's vivid narrative, but "*Strickland* does not guarantee perfect representation." *Richter*, 562 U.S. at 110. Whatever counsel's shortcomings may have been, his performance fell well within "the broad range of legitimate defense strategy." *Gentry*, 540 U.S. at 6.

*Third*, Waidla argues that counsel was ineffective because he did not present evidence of Waidla's good behavior in jail before his trial. The Supreme Court has recognized that a capital defendant's good behavior in jail is "relevant evidence in mitigation of punishment" because the jury could infer that the defendant's good behavior would continue if he were sentenced to life in prison. *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986). Thus, counsel could have used such evidence as part of his case for mitigation. But "[w]hen counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." *Gentry*, 540 U.S. at 8. Counsel conducted sufficient investigation to be aware that "there were no disciplinary proceedings against Mr. Waidla" in jail. Counsel could reasonably have decided that even a perfect jail record would be only weakly mitigating and that it was therefore a better strategy to focus on other issues.

Even if counsel's performance was deficient in this respect—indeed, even if it was deficient with respect to the other two categories of mitigating evidence—Waidla cannot establish prejudice. When assessing prejudice, "we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. The aggravating evidence was horrendous. *See Mickey v. Ayers*, 606 F.3d 1223, 1245 (9th Cir. 2010) (noting that "the facts of the crime play an important role in the prejudice inquiry").

Waidla bludgeoned Viivi with the blunt end of an axe with such force that he crushed her skull, fractured several bones, and knocked out her teeth. He then broke open her skull with the blade of the axe, cutting a flap of skull and scalp from the top of her head. The jury saw gruesome photos of Viivi's wounds.

Was there provocation for this brutal attack? Not at all. Viivi had invited Waidla to live in her home when he had nowhere else to go, and she allowed him to stay for more than a year. She tried to find him work and offered to pay for his college education. She helped Waidla translate the article that he would use at his trial to argue that his life should be spared. And she brought him on trips to her family's cabin, where Waidla later stole the axe that he would use to kill her.

Did Waidla display remorse after the murder? Far from it. He wrote a note to his friend and accomplice celebrating his escape—"Right now I am drinking Bavarian beer with the proper strength in one of the better class bars in Montreal"—and promising to go down "with a weapon in hand" should he be apprehended: "If you hear that I have been taken alive . . . (almost impossible) . . . then you should know that I did my best." Despite having given a full confession shortly after being arrested, he then testified at trial and denied any involvement in the murder, offering an implausible story that the jury rejected.

Considered alongside the facts of the offense, Waidla's proffered mitigating evidence is feeble. Start with the evidence of his behavior in jail. Yes, Waidla had shown an apparent commitment to work and study. But the jury could easily have discounted that showing, given that he had repeatedly rebuffed Viivi's earlier attempts to help him get a job and an education. *See Skipper*, 476 U.S. at 14 (Powell,

J., concurring) ("One arrested for a capital crime, and particularly a convicted defendant awaiting sentencing, has every incentive to behave flawlessly in prison if good behavior might cause the sentencing authority to spare his life."). Even if the jury believed his reforms to be genuine, it might have viewed his willingness to sweep the halls and distribute toilet paper as paltry recompense for the depravity of Viivi's murder. At trial, counsel described Waidla's construction projects for the Piirisilds as evidence of his work ethic and the contributions he could make to society; the jury was apparently unpersuaded. Similar evidence from his time in jail would have been unlikely to produce a different result.

The same is true of evidence of the oppressiveness of the Soviet Union. The guilt-phase testimony had already described the hardship Waidla experienced growing up in Soviet-occupied Estonia, his interrogations and beatings by the KGB, and his suffering in the Soviet Army. As the trial court observed, there was a "tremendous amount of evidence that was presented to the jury during the first phase that goes both towards sympathy and pity" for Waidla. Waidla now emphasizes an expert report on the Soviet Army, but for the most part it just retells *Escaping Through the Fog* in the third person. "Additional evidence on these points would have offered an insignificant benefit, if any at all." *Wong v. Belmontes*, 558 U.S. 15, 23 (2009) (per curiam).

That leaves the suggestion that counsel should have done more to "humanize" Waidla. The postconviction efforts to do so are unimpressive, and, had they been employed at trial, could easily have been counterproductive. As a youth, Waidla apparently displayed skill in marksmanship and photography. That is of minimal mitigating value because it says essentially nothing about him as a person. And given

that Waidla possessed a gun and had threatened a shootout with law enforcement, emphasizing his skill in marksmanship had an obvious potential to backfire.

What of the psychological reports that Waidla had a "characterological aversion to confrontation and violence"? That assessment does say something about Waidla as a person, but what it says is highly implausible—someone genuinely averse to confrontation and violence would probably not have hacked a woman to death with an axe. Introducing the reports would have opened the door to a cross-examination revealing that they were based on Waidla's false claims that Viivi's killing was unplanned and unintended. *See Cullen v. Pinholster*, 563 U.S. 170, 201 (2011) (explaining that a psychiatric report had "questionable mitigating value" because it "would have opened the door to rebuttal"). The jury would not have been swayed by opinions premised on a view of the crime it had unanimously rejected. More likely, the reports would simply have confirmed the jury's conclusion that Waidla was a liar.

The evidence about Waidla's family is likewise as much aggravating as mitigating. Indeed, this case illustrates the Supreme Court's caution that the effort to "'humaniz[e]' the defendant as the be-all and end-all of mitigation disregards the possibility that this may be the wrong tactic." *Pinholster*, 563 U.S. at 197 (quoting *Pinholster v. Ayers*, 590 F.3d 651, 692 (9th Cir. 2009) (Kozinski, C.J., dissenting), *rev'd*, 563 U.S. 170 (2011)). Waidla's close relationships with his relatives suggest some capacity for human connection, but discussion of those bonds would have undermined one of the primary themes in counsel's closing argument: that Waidla was "essentially alone in this world, and maybe because of that is to be a bit pitied rather than despised." Had the jury learned that Waidla had *not* lived a life of isolation and had

nonetheless chosen to commit murder, it would have had less reason to pity Waidla and correspondingly more reason to despise him.

The length of the jury deliberations provides little reason to believe that the postconviction evidence would have made a difference. The new evidence "would barely have altered the sentencing profile" for the jury, and some pieces might have made it worse. *Strickland*, 466 U.S. at 700. In the end, the jury still would have been presented with a person who, after growing up in a totalitarian regime, had the extraordinary good fortune to escape it and find freedom in the United States—and then squandered that by becoming an axe murderer. Nothing in Waidla's habeas petition has made any sense of that incomprehensible offense. It would be far from unreasonable to conclude that, with or without the new evidence, the jury's verdict would remain the same.

\*     \*     \*

The Supreme Court has held that the AEDPA standard is "difficult to meet" because the statute "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Richter*, 562 U.S. at 102–03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in the judgment)). Reviewing Waidla's trial more than 30 years after it took place, the court today decides that counsel could have done a better job, even though doing a better job would have involved presenting what even the court describes as a "modest" case for mitigation. Whatever the merits of that view, the California Supreme Court's contrary conclusion was not "so obviously wrong that its error lies 'beyond any

possibility for fairminded disagreement.'" *Shinn*, 141 S. Ct. at 523 (quoting *Richter*, 562 U.S. at 103).

We have repeatedly been reversed for failing to defer to reasonable determinations of state courts under AEDPA. It appears that we have yet to learn the lesson of those cases.